IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,            **DECISION AND ORDER**

v.            09-CR-0096(S)(M)

ALEX KOSCHTSCHUK, et al.,

           Defendants.

_____

           This case was referred to me by Hon. William M. Skretny for supervision of all pretrial proceedings [108].[1] Familiarity with the background of this case is presumed, and will be discussed only as necessary for purposes of this Decision and Order.

           Defendants have filed a number of motions, including a motion to dismiss the Third Superseding Indictment [143] due to "outrageous government conduct" [386], and a motion to suppress all evidence obtained pursuant to Title III warrants signed by Judge Skretny [368]. Defendants have requested an evidentiary hearing in connection with these motions. For the following reasons, I conclude that a hearing should be held. Resolution of all other issues raised in defendants' pretrial motions will be deferred pending conclusion of the hearing.

**BACKGROUND**

           Defendants are allegedly members of the Chosen Few Motorcycle Club ("CFMC"). They are charged in a thirty-two count Third Superseding Indictment with, *inter alia*, numerous racketeering counts. The investigation leading to these charges arose because of

---

[1]      Bracketed references are to CM/ECF docket entries.

increased hostilities between the CFMC and the Kingsmen Motorcycle Club ("KMC") beginning in or about July 2008. In connection with the investigation, the government made extensive use of a "confidential human source" ("CHS"), whom it subsequently identified as David Ignasiak, a (now former) CFMC member.

According to the government, when it first began utilizing Ignasiak as a CHS in 2006, he was warned that "he could not engage in any criminal activity without the prior approval of the FBI . . . and that if he did engage in criminal activity without this approval, he was subject to prosecution for it". Government's Bill of Particulars [321], p.3. In the summer of 2008, Ignasiak began wearing a wire in order to record conversations with CFMC members. Musitano Affirmation [386], ¶17. On August 20, 2008, he told FBI Special Agent Kenneth Jensen, Jr. that he had been asked to accompany CFMC members that evening in order to "find and assault any member of the KMC that the group came across". Jensen Affidavit [370], Ex. D, ¶30. According to the government, "prior to *and in anticipation of* that incident [the assault] the case agents instructed David Ignasiak that, to the extent possible, he was to act as a 'spectator,' and was to participate in the activities of the co-conspirators only to the extent necessary to prevent the participants from discovering that he (Ignasiak) was cooperating with the FBI". Government's Bill of Particulars [321], p.3 (emphasis added).

In Count nine of the Third Superseding Indictment, the government alleges that on the evening of August 20, 2008, several CFMC members attacked KMC member Eugene Siminski with an axe handle. SA Jensen referred to that incident in applying to Judge Skretny for a Title III intercept warrant on October 22, 2008. In his Affidavit in support of the application, SA Jensen downplayed Ignasiak's involvement in the assault, stating that Ignasiak

(whom he referred to as "CHS" rather than by name) told him that he was in a vehicle at the time of the assault and that he "locked the door of the vehicle intentionally so that he would not have to participate in the violence". LaTona Declaration [368], Ex. D, ¶31. SA Jensen then vouched for Ignasiak's credibility, telling Judge Skretny that he had "listened to the portion of the recording where the above described events occurred and state that the information provided in the debriefing of the CHS appears accurate". Id., ¶32. He also told Judge Skretny that the "information provided by CHS is accurate and reliable and has never proved to be intentionally false or misleading". Id., ¶13.

Whereas he assured Judge Skretny that the recordings confirmed that Ignasiak did *not* participate in the attack on Siminski, several months later SA Jensen gave me a different version of events. In his May 6, 2009 Affidavit submitted in support of the Complaint which commenced this criminal proceeding, SA Jensen told me that "[b]ased on recordings, I am aware that on August 20, 2008, BRADLEY BEUTLER, MARTIN WHITEFORD, PAUL ROORDA, *and David Ignasiak* attacked a KMC member . . . with an axe handle." LaTona Declaration [368], Ex. F, ¶14 (emphasis added).

The government argues that "the fact that agent Jensen may have changed his description of the attack from October 28, 2008 to May 9, 2009 does not, as a matter of fact, mean the earlier representation was false". Government's Response [384], p.14.[2] Maybe so, but the discrepancy certainly warrants further inquiry. A review of the recording of that incident (Ignasiak was wired at the time) strongly suggests that, far from being a mere "spectator", Ignasiak was at least an avid cheerleader, if not the outright orchestrator of the assault. He can be

---

[2] I assume that the government intended to refer to October 22, 2008 and May 6, 2009, as those are the dates of the Affidavits in question.

heard telling CFMC members that "I talked to Al [Koschtschuk], he requested me to run the situation tonight . . . . Anyone that's not interested or don't like what I said then, leave. Simple as that". [386-1], p.3.³ Later, he states "this is the opportunity, come on guys . . . . Paul why didn't you f*cking hit him". Id., pp.25, 27. In fact, when one of the other CFMC members at one point suggests that they damage Siminski's boat instead of assaulting him, Ignasiak replies that they are "going after individuals, not property . . . the boat didn't do nothing". Id., p.5.

      The recording of the assault strongly suggests that Ignasiak was squarely in the midst of the fray, rather than locked in a car, as he allegedly told SA Jensen. Indeed, if Ignasiak were truly concerned about not arousing undue suspicion, then locking himself in the car while the assault was in progress would seem an unlikely thing to do. In fact, at one point, one of the other CFMC members says to make sure that the "child protection" door locks are not engaged, to which Ignasiak replies "nothing like being pinned in". [386-1] p.9.

      The government's acknowledgment that "Ignasiak's conduct in that count [relating to the assault on Siminski] wasn't perhaps what it should have been" ([386], Ex. J, pp.2-3) leads to further questions as to whether Ignasiak was being truthful with SA Jensen when describing the August 20 incident, and/or whether SA Jensen was being truthful with Judge Skretny.⁴

---

      ³    Although this statement was recorded, the alleged instructions to Ignasiak from Koschtschuk were for some reason not recorded.

      ⁴    At this point I have not concluded that anyone was (or was not) being truthful. I will consider the matter further upon conclusion of the hearing.

## ANALYSIS

**A.      Outrageous Government Conduct**

"The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice . . . or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." United States v. Schmidt, 105 F.3d 82, 91 (2d Cir.1997), cert. denied, 522 U.S. 846 (1997). "Especially in view of the courts' well-established deference to the Government's choice of investigatory methods . . ., the burden of establishing outrageous investigatory conduct is very heavy." United States v. Rahman, 189 F.3d 88, 131 (2d Cir.1999), cert. denied, 528 U.S. 982 (1999). In fact, "a due process challenge to an indictment based on outrageous government conduct has almost never succeeded". United States v. Williams, 372 F.3d 96, 112 (2d Cir. 2004).

However, the fact that defendants may face an uphill battle in proving outrageous government conduct does not allow me to ignore the issue altogether. "[A] claim that the government has acted outrageously is taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers. Sometime's the government's involvement in manufacturing crime is demonstrably outrageous, and in those cases, the convictions of targeted defendants have been set aside." Schmidt, 105 F.3d at 91.

"Although there is no set formula for determining when Government conduct transgresses the boundaries of permissible investigative techniques, there are some recognized factors . . . . [W]e will closely examine those cases in which the Government misconduct injures third parties in some way." United States v. Thoma, 726 F.2d 1191, 1199 (7th Cir.1984), cert. denied, 467 U.S. 1228 (1984). "It would be unthinkable to permit government agents to instigate . . . beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction." United States v. Chin, 934 F.2d 393, 400 (2d Cir.1991) (*quoting* United States v. Archer, 486 F.2d 670, 676-77 (2d Cir. 1973)). *See also* United States v. Longo, 70 F.Supp.2d 225, 270 (W.D.N.Y. 1999) (Skretny, J./Foschio, M.J.) ("What constitutes a demonstrable level of outrageousness cannot be identified with precision, but the due process claim, in the rare instances when successful, has prevailed to restrain law enforcement activities that involve . . . outrageous violation of physical integrity").

"[T]he defense of outrageous Government conduct is not for the jury to consider, but must be decided by the trial court." United States v. Nunez-Rios, 622 F.2d 1093, 1098 (2d Cir. 1980).[5] "A motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge and review of rulings thereon is *de novo* . . . . Clearly,

---

[5] This defense is to be distinguished from the defense of entrapment, which is decided by the jury. "A successful entrapment defense requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit . . . . A defendant who unsuccessfully advances an entrapment defense before the trier of fact may nonetheless succeed in mounting a successful attack on an indictment based upon a showing of governmental conduct that is found by the court to be outrageous." United States v. Cuervelo, 949 F.2d 559, 565 (2d Cir. 1991).

such a review is facilitated when a hearing on the issues presented has been held by the district court and a record has been constituted." Cuervelo, 949 F.2d at 567. While it is true that "[w]ithout disputed facts, no hearing [is] necessary", United States v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994), in this case the facts - and the inferences to be drawn from those facts - are sharply in dispute.

        The government argues that defendants' "speculation does not implicate the government or the FBI in Ignasiak's actions. Thus, at best, the defendants can claim that Ignasiak personally engaged in 'outrageous conduct', but that is it as far as it goes". Government's Response [409], p.6. Not necessarily. As indicated in the government's Bill of Particulars, agents instructed Ignasiak *in anticipation* of the August 20, 2008 assault as to what he could and could not do, and it does not appear from that document that the government unequivocally forbade him from actively participating in the assault if necessary to avoid arousing suspicion.

        Moreover, the standard for determining whether an individual is acting as "an agent of the government . . . does not take a solely *ex ante* perspective . . . . The government may become a party [to the individual's actions] through nothing more than tacit approval". United States v. Knoll, 16 F.3d 1313, 1320 (2d Cir.), cert. denied, 513 U.S. 1015 (1994). In light of the government's warning to Ignasiak that he would be prosecuted for participating in criminal activity without FBI approval (government's Bill of Particulars [321], p.3), it will be highly relevant to learn whether the government has referred (or intends to refer) Ignasiak for prosecution relating to the assault on Siminski, or for damaging the CFMC clubhouse with a baseball bat on March 11, 2009. Bruce affidavit [239], ¶26.

The government contends that it was the latter incident, coupled with Ignasiak's refusal to return his "patches and colors" when he quit the CFMC in February 2009, which led some of the defendants to plan a "hit" on Ignasiak in the spring of 2009.[6] *See* SA Jensen's affidavit in support of the Complaint in United States v. Koschtschuk, et al., 09-M-1031, ¶¶18, *et. seq.*). That plan, in turn, was the subject of charges in the Complaint - and is the subject of charges in the Third Superseding Indictment (see, e.g., Counts Eleven and Twelve) - of conspiracy to assault or murder Ignasiak.

The government's level of knowledge, involvement with, and approval of Ignasiak's actions are appropriate subjects for inquiry at the hearing. "It cannot be gainsaid that myriad facts and circumstances can arise in the complex context of what is commonly frequent and close interaction among government agents, witnesses and prospective defendants. A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government, as the court undertakes to sort through the various conflicting claims, and permits factual determinations to be made by the district judge. A hearing also provides the district judge with an opportunity to observe the demeanor and assess the credibility of various witnesses. Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist." Cuervelo, 949 F.2d at 567.

In advance of the hearing, defendants seek production of the grand jury minutes in order to determine which version of the Siminski assault was presented to the grand jury.

---

[6] AUSA Bruce stated at oral argument that "the FBI returned his colors to the club". At this point it is unclear when this occurred, or why it was not done by Ignasiak himself. If the government was interested in averting violence (*see, e.g.*, ¶¶36-38 of SA Jensen's October 22, 2008 Affidavit, stating that agents met with defendant Alex Koschtschuk on August 22, 2008 to encourage him to end the hostilities with the KMC), then encouraging Ignasiak's prompt return of his colors to the CFMC would seem to have made sense.

Musitano Affirmation [386], ¶28. Because the grand jury presentation bears no relation to whether Ignasiak was acting as a government agent at the time of the assault, I conclude that this discovery is not warranted.

**B.     Franks Hearing**

Defendants also seek to suppress all evidence obtained pursuant to the Title III intercept warrants issued by Judge Skretny, arguing that the showing of necessity for those warrants was inadequate. "While Title III allows for wiretaps in limited circumstances, law enforcement must apply for a court order before conducting such surveillance, 18 U.S.C. §2518, and set forth 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous,' *id*. §2518(1)(c). The district court must ensure that this standard has been met, *id*. §2518(3)(c), so that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime'." United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009).

In connection with their motion to suppress, defendants request a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). In order to obtain such a hearing, defendants must make a "substantial preliminary showing" that "a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit", and that " the statement was necessary to the judge's finding". United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (citing Franks). Defendants seek a hearing concerning "both material misrepresentations and material omissions regarding the necessity requirement." Defendant Whiteford's Reply [435], p.

4. Although Franks dealt with the issue of probable cause, "[t]he necessity requirement is also subject to the *Franks* analysis for challenging the veracity of affidavits supporting the wiretap application." United States v. Moran, 349 F.Supp.2d 425, 461 (N.D.N.Y. 2005); United States v. Rajaratnam , 2010 WL 3219333, *1 (S.D.N.Y. 2010).

For the reasons previously discussed, I conclude that defendants have made a substantial preliminary showing that SA Jensen's representations concerning Ignasiak's involvement in the August 20 assault may have been deliberately or recklessly false. If so, it becomes "no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements". United States v. Weinstein, 452 F.2d 704, 713 (2d Cir. 1971), cert. denied, 406 U.S. 917 (1972). *See also* United States v. Schenck, 1994 WL 55765, *4 (W.D.N.Y. 1995) (Skretny, J.) ("the Court finds that Paul Schenck made false statements under affirmation concerning a material matter . . . and that his entire testimony is therefore suspect").

In turn, the questions which have arisen regarding Ignasiak's truthfulness and reliability may infect the entire warrant application. "Courts have held *Franks* hearings where a defendant has shown that an affiant recklessly depended on and included information from unreliable informants." United States v. Makki, 2007 WL 781821, *10 (E.D.Mich. 2007); United States v. Banks, 2009 WL 3165766, *4 (N.D.N.Y. 2009) (conducting a Franks hearing where the affiant omitted facts that undermined the credibility of the complainant). For example, had Judge Skretny had been aware of Ignasiak's credibility issues, it may have weakened his view of SA Jensen's  necessity showing, which relied heavily on Ignasiak's concern that he was under suspicion by the CFMC's hierarchy (thereby limiting his ability to make consensual recordings). La Tona Affidavit [368], Ex. D, ¶83.

Recognizing that "in the context of a *Franks* challenge to a search warrant, the trial judge has discretion to determine what type of hearing is necessary to determine the credibility of the affiant", <u>United States v. Ostipow</u>, 2009 WL 1259967, *5 (E.D.Mich. 2009), <u>Report and Recommendation adopted by</u> 2009 WL 1312886, I conclude that a <u>Franks</u> hearing is necessary explore the veracity of SA Jensen's representations concerning Ignasiak's involvement in the August 20 assault, as well as his other representations concerning the necessity for electronic surveillance.

In advance of the hearing, defendants seek "all documents and information which might tend to show that the Government had failed to disclose all of the information required by statute" for demonstrating necessity. LaTona Affidavit [368], ¶58. I agree that defendants are entitled to some pre-hearing discovery, and order the government to provide them with the surveillance reports existing up to the dates of the respective warrant applications by March 18, 2011. *See* <u>United States v. Humphrey</u>, 2011 WL 691767, *2 (W.D.N.Y. 2011) (Scott, M.J.).

**CONCLUSION**

For these reasons, a hearing will be held before me to further explore defendants' claims with regard to outrageous government conduct and the validity of the Title III warrants. Although I will not define the precise contours of the hearing at this point, I wish to emphasize that it will be limited to those areas in which showings of potential improprieties have been made, and may not be treated as a vehicle for defendants to lay bare the government's entire case - nor will I allow unlimited questioning by each defendant's attorney.

Another conference will be held on March 23, 2011 at 10:30 a.m. to further refine the parameters of the hearing. The parties shall file their proposed witness lists, including areas of intended inquiry, by noon on March 22, 2011. The resolution of all other aspects of defendants' motions [368 and 386], and all other issues raised in defendants' other dispositive pretrial motions, will be deferred pending conclusion of the hearing.

**SO ORDERED**

Dated: March 10, 2011

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge